of America or larger than it's not to exceed 30 minutes per side, Ms. Foster for the appellant. You may proceed. Thank you, Your Honor. May it please the court, I would like to reserve five minutes for rebuttal. The government did a truly masterful job at trial of presenting Marvin as a master manipulator, an evil genius, a very sinister man who had to be killed to be contained. There was a different story to tell that was thwarted at trial by trial counsel's deficiencies and that story was not told in 2255 proceedings because of a total lack of due process. Because this is a death penalty case, the Supreme Court tells us the need for reliability is at its tools for testing the reliability of evidence in 2255 proceedings, discovery, depositions, a hearing, subpoena power, cross-examination. Contrary to the clear law of this circuit, Marvin Gabrion was denied all of this. Not only can you send this case back for proceedings to test the reliability of what has come before, but you do so regularly. This court's precedent clearly establishes that a hearing is mandatory unless the record conclusively shows that petitioner is entitled to no relief, that the burden for establishing entitlement to an evidentiary hearing is, quote, relatively light, and the burden to show entitlement to a hearing is significantly lower than that required to show entitlement to relief on the merits. In short, where the facts are in dispute, a hearing is required. Because Gabrion lost below, the claim is reviewed under an abusive discretion standard. Gabrion must show that the 2255 court abused its discretion when it denied all discovery and a hearing. This court's precedent establishes that a court abuses its discretion when, one, it relies on clearly erroneous findings of fact, or two, it improperly applies the law, or three, this court is firmly convinced that the trial court committed a clear error of judgment. Did you request particular forms of discovery, or was it more of a blanket denial on the part of the district judge? No, Your Honor, we very much requested particular forms of discovery. There was a separate motion for depositions. We didn't ask for depositions of all trial participants, but rather the ones that were integral to the claims that we were bringing. So there was a separate motion for depositions. There was a separate motion for discovery that requested various documents. And for all of these things, we provided a lot of reasons to the district court of why we needed these things. As I said, none of this was, you know, we weren't asking for 180 things. Our requests were very limited. I'm sorry for these basic questions, but was it Judge Bell who denied the discovery requests initially? Yes, my recollection is that Judge Bell initially said that, you know, we had a hard time interpreting honestly what Judge Bell said initially. He said that he wanted to look at the entire case before ruling on whether we were entitled to discovery in an evidentiary hearing. We weren't exactly sure what to make of that, but then in due course, Judge Bell left the bench and Chief Judge Yonker took over the case, at which point we asked Judge Yonker to review Judge Bell's rulings. Judge Yonker then said that he wanted to review the entire case before he made those rulings. And then eventually he denied discovery, all discovery. He denied a hearing. He denied relief on the merits, all simultaneously. So we never had the opportunity to sort of operate on plan B. Generally, when I'm involved in these cases, the court rules on the motion for evidentiary hearing and the discovery motions before it rules on the petition on the merits, but that's not what happened here. The 2255 court here had no more insight into this case than this court because, as Judge Moore noted, Chief Judge Yonker was not the trial Judge Bell was. In the main, trial counsel was ineffective in two important respects that were prejudicial to Gabrion at the penalty phase. Defense counsel failed to counter the government's false evidence that painted Gabrion as uniquely sinister because he was able to, quote, maneuver around and through a county's entire criminal justice system and its elected prosecutor. Having successfully painted Gabrion in this light, it was not a far leap for the jury to accept the government's claims that Gabrion was feigning or exaggerating mental illness. Trial counsel's failure to rebut the government's claims and failure to present available evidence that predated the crime and would support the claim that his suffering was real sealed the deal and resulted in his death sentence. This afternoon, I would like to talk about how the lower court's refusal to grant a hearing and any discovery on at least two claims was a violation of due process in this court's clear precedent. Number one, Mr. Gabrion alleged his trial counsel was ineffective for failure to properly investigate, prepare, and present the penalty phase. The other claim I want to talk about this afternoon concerns the 2255 court's refusal to grant a hearing or any discovery on the conflict of interest claim. Mr. Gabrion was entitled to discovery on a hearing on his allegations of penalty phase ineffectiveness. He alleged that 2255 counsel failed to discover and present an extraordinary family history of major mental illness. This is important because mental health experts agree that a family history of major mental illness makes a person infinitely more vulnerable to suffer mental illness. The lower court did you, excuse me, did you present in your materials an family history that your report, your 150-page report, identified that that showed some consequence for Mr. Gabrion? We did not, Your Honor. However, we did cite the literature, the psychiatric, psychological, mental health literature is robust in this area. It's in the DSM, and we did cite all of that. And the lower court did not dispute that that was true. However, the court concluded that Mr. Gabrion could not meet his burden of proof because he was evaluated by nine mental health experts prior to trial, eight of whom concluded he was not mentally ill. But critically, none of those mental health experts were aware of the significant history of mental illness in Gabrion's family because trial counsel were not aware of it. They failed to investigate and discover it. Indeed, at least one of those eight experts, and we think two, had changed his opinion in another case, based upon evidence nearly identical to what Gabrion presented here. The trial counsel, and this would be in addition, Judge Moore, to the question that you just asked, the trial court also faulted 2255 counsel for not providing an affidavit from a mental health expert who found Gabrion mentally ill. But in fact, it is the actions of the 2255 court that prevented counsel from providing that affidavit. Some background is necessary to understand that claim. As I mentioned earlier, the court denied the petition on the merits. At the same time, it denied all motions seeking discovery. It also did not, at the same time, it denied the motion for an evidentiary hearing, and critically, it denied Gabrion's motion for an order authorizing Gabrion's expert to have access to him at the penitentiary in Terre Haute where he was housed. The United States Penitentiary in Terre Haute requires an order from the court authorizing access to the expert. That has nothing to do with the security of the institution. The penitentiary does its own investigation of passes through those doors, counsel, experts, whoever. The motion for access had been pending for seven months at the time it was denied. It did not seek funding because funding had already been approved from other sources. It did not, as I mentioned, it did not concern security. These orders are routinely granted. I've been practicing capital defense law for 39 years. I have never had one of these orders denied except for this one in this case. Would you have had to have an expert examine Mr. Gabrion in order to say that the mental health conditions of his family could likely lead to mental health problems of him? No, Your Honor. I don't think so. As I mentioned, we cited the literature in our briefing to the court. Indeed, the DSM says, the DSM, the Bible for mental health professionals, states that a person with a close family, with a close family member that suffers, I'm sorry, I can't remember if it's bipolar or schizophrenia, has a 10 times greater likelihood to suffer similarly. The Why is it critical that you have an expert go see him at the penitentiary? Because what we were trying to do was present expert testimony, both that what had happened before was inadequate, and we wanted to put forward proactively a mental health diagnosis and a coherent story around what this man's problems were, because that clearly was not done at trial. Zero jurors found on the verdict form that he suffered from mental illness. Court was well aware that his direct appeal, because we had been trying to litigate competency, the court was well aware that his direct appeal counsel, who represented him for over 10 years on direct appeal, and who had over 100 years of experience dealing with mentally ill clients charged with the death penalty, believed that he suffered mental illness. We also put forward to the court that it was our belief that he was mentally ill and incompetent. I understand the court did not create the COA on competence, but I think that does bleed over a little into the penalty phase questions. In denying the motion for access to Gabriel by the mental health expert, the court said that we had failed to provide a reason for the request. It is our position that because we weren't seeking funds and because this had nothing to do with security, that we didn't have to show much to get the order granted. Nevertheless, we provided a wealth of reasons why that request, that simple pro forma request, should have been granted. I would urge the court to look at docket number 154. It's page after page after page of justification. So if I could just put forth a position that is probably your opponent's. There was a summary by your mitigation specialist that was introduced at trial, and then you on the 2255 have a 10 times longer one. But why is it not just cumulative material in your 2255 development of the evidence as opposed to something that would warrant 2255 relief on IAC at the penalty phase? Because the trial lawyers did not... I'm sorry, did you finish your question? Because the trial lawyers did not investigate nor did they discover anything having to do with Gabriel's familial history of major mental illness. And because the government was so persuasive in arguing that he was malingering, the fact that Gabriel's family suffered from major mental illness would have rebutted that evidence. Gabriel's family has more major mental illness in his family than any case I've seen before. That increases his risk of suffering similarly. Trial counsel was unaware of all of that. In essence, the lower court refused to grant a simple motion for access and then used its own actions against our client to deny relief. Gabriel also alleged that his counsel was ineffective for failure to discover and document the full extent of his head injuries. Our social history lists 17 head traumas and impacts that we have either a witness or documentation to support. The lower court found that the most compelling examples of head injuries were the ones that were presented at trial. But the trial team focused almost entirely on the car accident that immediately preceded the social security disability determination. The defense expert, Dr. Shah was provided, the defense expert was provided only the records from a single car accident. And the government cross-examined on whether that accident was staged and whether other incidents that he was relying upon occurred at all. Two of the mental health examiners that evaluated Gabriel in pretrial that the government relies upon, whose reports were later relied upon by other examiners, assumed there was but one head injury. And the government presented Dr. Greismer at trial to rebut the brain trauma testimony. Dr. Greismer testified that part of why he believed there was no traumatic brain injury was because following a trauma, one would expect to see improvements in functioning over the following one to three months. And to the contrary here, Gabriel evidenced a decade of deterioration. This led Dr. Greismer to believe that Gabriel was feigning or exaggerating mental health problems. But Dr. Shah testified and the literature supports that what Dr. Greismer said is correct, unless there are recurrent injuries. Dr. Greismer also testified that he did not believe the PET scan of Gabriel's brain was abnormal, though he did allow that there was a difference in metabolic uptake. He concluded that this was not abnormal because injuries caused by an acceleration deceleration event, like a car accident, would be expected to be in a different part of the brain. And one would expect the injury to be symmetrical, and that's not what he was seeing on the PET scan. But some of the traumas detailed in our social history and absent from trial counsel's investigation are not auto accidents. In short, Gabriel presented sufficient cause to require a hearing with regard to this aspect of the your time is running out. And I do hope that you will get to the question of the IAC having to do with the conflict of interest. Yes, your honor. If you want to fit, I don't need to stop you from any key point you want to make here. But I just, you've got about eight minutes left. Okay, I'll keep tab of my time, if that's okay. Sure. And every turn the lower court faulted Gabriel for not meeting his burden of proving claims while simultaneously denying him the tools the law provides. So for example, regarding discovery, the trial court stated in its opinion at page 109, it is true the court has not granted all of Gabriel's requests for discovery. Let's be honest here. The court granted none of Gabriel's requests for discovery. Gabriel asked for the experts that had for the records that had been relied upon by experts. He noted to the court that in the expert reports, there were things listed that were not contained in trial counsel's file. Indeed, there were nearly nearly 3000 pages of documents relied upon by Dr. Greisenberg, who was I was just talking about, who testified at the penalty phase for the government. That wasn't in trial counsel's file. The court said we could not have that stuff. Also, the psych records created by BOP personnel when Mr. Gabriel was sent for competency evaluation during these proceedings, we asked for that the court said we could not have it. We asked for Marvin's Gabriel's own social security disability records. Those records apparently demonstrate that Gabriel was placed on social security disability for mental health concerns prior to the offense conduct, and that social security determined he was unable to manage his own finances and required a payee. Again, this is all prior to the crime events. Social security records, again, were important because it could be valuable evidence to rebut the government's malingering argument. Evidence that the government declared the same government that was seeking Mr. Gabriel's execution had declared not only that he was disabled, but that he was so disabled, he required a payee. Did the government actually have the social security records or are they lost? Yes, Your Honor. In fact, we reached out to social security with a release. And we were told by social security that they no longer had the records because they had been given to the government. We know that the United States Attorney's Office at one point had those records because in Dr. Follis's report, she's one of the competency examiners. There's a note at page six that indicates that she was told by the United States Attorney's Office that Gabriel had been granted social security disability for, and I quote, mental impairment. So did you ask for the records from the government, from the U.S. Attorney's Office? Yes, Your Honor. We asked the court to issue a subpoena as well. We were told my recollection is we were told the government did not have them. We asked for a subpoena. It's been my experience that people look harder for records when there's a subpoena involved. We also investigated the possibility that perhaps the government was probation. It appears that the probation department had Mr. Gabriel's disability records from social security at one point. In a previous PSR, they noted not just his primary diagnosis from the SSI records, but also a secondary diagnosis. So we believed that they had them as well. The court, however, refused to issue the subpoena, a very simple request. Again, 2255 counsel's difficulties are directly attributable to the lower court's refusal to authorize the tools that this court says we're entitled to. We had good cause. Those records apparently showed that Mr. Gabriel had a quote, mental impairment. That's exculpatory as the sentence. We were entitled to it. With regard to the conflict of interest, it is our position that Mr. Gabriel was also entitled to discovery and a hearing on his conflict claim. Mr. Yates participated in Gabriel's defense while simultaneously representing a critical witness against him in the death penalty phase. That witness has since recanted his very disturbing and damaging penalty phase testimony. Although- How does one decide whether an attorney is representing a client? Because Mr. Gabriel had two other lawyers, Mitchell and Stebbins, that were his official lawyers. So how does one decide that Yates was actually, quote, representing, unquote, your client? So I think that one would have to look at what were the duties that he was undertaking. And I think that it is very clear that we don't know the full duties at this point that he was undertaking. Documents created contemporaneously with the events show that he consulted with appointed counsel regarding the critically important jurisdiction motions, and that he was asked to assist in the research and preparation of a motion challenging the death penalty, as applied in this case, as well as a challenge to the specific aggravators. He met personally with Mr. Gabriel. He was asked to strategize about potential suppression issues, as well as how to force the government to provide more discovery. He assisted in the transfer of Gabriel's placement pretrial, and he assisted in the unsuccessful search for Gabriel's social security records. I mean, in short, I think it's pretty clear that these lawyers were relying upon a conflicted lawyer for a whole lot of things. He simultaneously- So the question on the other side is, what exactly was Mr. Yates doing for Lunsford? Is it clear that Yates was doing anything when Lunsford testified at the penalty phase? He had represented him in the grand jury, Your Honor. And we believe that he was also present when Lunsford testified, although clearly that's something that I think a hearing and discovery would flesh out. At the end of the day, we need a hearing and discovery on this claim. It's clear that there was stuff going- that there's enough- I think it's clear that there's enough going on here that should pique the court's curiosity and be concerned. He was actively representing competing interests. He represented the guy who testified to what is probably the most disturbing penalty case- A specific question that I have is, is there any evidence that you can point to that Yates was representing Lunsford when Lunsford testified at the penalty phase? We suspect that he was representing him at that time, yes, Your Honor. However, we suspect is not an answer to the question. The question was evidence, I think. Well, I don't have any evidence because I have no discovery and I have no hearing. I would really like to have some evidence, yes. It is clearly a question that we would like to ask Mr. Yates under oath. Gabrion is entitled to a hearing to sort out the conflicting accounts of Yates' involvement in this case presented. There's conflict between the Yates affidavit. He says he didn't represent Gabrion and then he goes into a big dissertation of a number of the things that he did. He visited him. He did some research. I mean, those are not things that a conflicted lawyer does. I'm a federal defender in Indianapolis. If I have a conflict, my judges don't ask me to go do a bunch of work for somebody, but don't enter an appearance, but go do a bunch of work for the death penalty. We were also entitled to a hearing to resolve the conflicts between Yates' affidavit and Lunsford's affidavit. Yates' affidavit says Lunsford's affidavit is false with regard to a number of the claims that are in there. I see my time is up. If you don't have further questions, I will stand by. Thank you. Mr. Verhey. May it please the court. I'm Timothy Verhey. I represent the United States on the Appeal. I was also the prosecutor in Gabrion's trial 20 years ago. I hear you having an interest in the conflict issue raised by the defense. Let me start there. I think that Gabrion cannot get over a fundamental threshold issue with the conflict of interest claim here, which is you've got to be the lawyer for the defendant before the conflict rules come in. That's when the duty of loyalty attaches to a client. As we cited in our brief, the general rule is you've got to be counsel of record before the conflict rules apply. There are some exceptions, and we've tried to flesh those cases out that discuss the exceptions. We cited for the court the Moss case, Rubin v. Gee, and the Triana case that we cited in our 28J letter. All of those show us, I think very clearly, that you have to not only be counsel of record in some capacity, you have to do something else. You have to negotiate. Isn't this really quite concerning that even though Mr. Yates was not one of the two, what I'll call counsel of record, Mr. Yates was doing a lot of lawyer work ostensibly to be helping Mr. Gabrion. Indeed, even after the magistrate judge told Mr. Gabrion he couldn't have Yates as his counsel, then the district judge involves Yates in doing a bunch of things on behalf, theoretically, of Gabrion. It seems to me that whether Yates is officially counsel of record or not, Yates is doing things ostensibly on behalf of Gabrion. Why should that not trigger conflict of interest concerns? I think there's a lot of ways to answer that. First of all, a lot of what Yates was asked to do simply flowed from the fact that he was the federal defender. So, did Mitchell and Stubman have problems getting funding sometimes? Yes, they did. They got Yates' help in trying to straighten that out. Was Gabrion unhappy about where he was staying at the jail prior to his trial? Yes. So, Yates tried to get him to a new facility and that happened. Did Mitchell and Stubman need assistance in general attacks on the Federal Death Penalty Act or aggravating factors? Everybody looks for that kind of stuff. If you have a defense case, there are places all over the United States that are death penalty clearinghouses. Yates did that. That looks like lawyering. He certainly, I'm sure, did a good job of it. But I think it's very important to remember that it was filtered through Mitchell and Stubman. They're the ones that approved whatever research was done. They're the ones that signed the pleadings. Yates never entered an appearance. He never signed a pleading. He never appeared in court to advocate for Gabrion. He didn't do anything that appears to be the absolute minimum you have to do before this concern attaches. Mr. Verhey, could I summarize this argument accurately by saying that counsel for Mr. Gabrion did what many counsel do and that is to defend the defendant. I think that's exactly what happened here. And I would just like to outline that there's an important reason for this general rule that conflict of interest rules don't attach until it's very clear that the lawyer at issue is being an actual advocate for a defendant that expects a duty of loyalty. Because you could see if you could have lawyers all over the place causing conflicts when they give casual advice to a criminal defendant. So even in the Moss case, which I know, Judge Moore, you were one of the judges on, the panel there thought there was no conflict problem even when the lawyer at issue, Murphy, entered an appearance for Moss and appeared for him at his arraignment. That turned out not to be significant because on page 457 of that opinion, the panel noted Moss knew that Murphy was not his lawyer. So he didn't have, in other words, a reason to expect any duty of loyalty. Here, as you've already noted, Gabrion wanted Yates to be his lawyer because Yates had represented him earlier, but he was told on the record by the magistrate judge, you can't have Yates. He has a conflict. So that was put out there. Later after that, the district judge encourages that Gabrion work with Yates. Well, I would characterize that as a Dutch uncle type help. That appears to be Gabrion was not getting along with Mitchell and Stebbins. Gabrion still liked Yates. So Yates apparently met with Gabrion and said, your counsel are good people. I like them. They're doing a good job. You should work with them. There's no proof, whatever, that Gabrion ever got legal advice from Yates or Yates did anything in a legal capacity for him. So had he been counsel of record and been one of the lawyers actively representing Gabrion, that puts it in more of a problematic area, like Rubin versus Gee, where the lawyer with the conflict was actually entering an appearance and acting for the defendant. What was Yates' role vis-a-vis Lunsford at the penalty phase? I don't remember him being in the courtroom at all because Lunsford was already serving a sentence that had been posed a long time earlier. We subpoenaed Lunsford. He appeared. We didn't deal with Yates on that at all. Lunsford testified. And as we all know, he was cross-examined by Mitchell, ably cross-examined by Mitchell, one of Gabrion's lawyers, and admitted that he hoped to get a benefit out of it. So Yates was not in the picture on that. And as you probably know, a defendant's lawyer's advocacy period expires pretty much when the direct appeal is over with. So that had long expired. Did Gabrion's 2255 lawyers seek to take discovery of Yates regarding what Yates' role was in representing Lunsford? We know that Yates was there at the jury testimony, correct? But we just don't know whether Yates was there in advising Lunsford at the penalty phase. So did the defense lawyers seek discovery on Yates' role? Well, let me be clear about that. When the defense began its 2255 case, they appeared in court, if you look at record 75 page ID 2639, and their discovery demand was they had to reinvestigate the entire case as if nothing had been done at all. So that was their discovery request right out of the box. And that's what a death penalty defense attorney does, is try to do everything possible to go through the case all over again. They also made an important statement to Judge Yonker. As the issues became more focused, they told Judge Yonker that they had every page of Mitchell and Stebbins' internal files and had interviewed them. And that's at page ID 2642. And I think that's an important fact here, Your Honor, because that's pretty much the universe of discovery that's necessary to come up with a viable claim that deserves more attention through discovery or hearing. I mean, who knows about the representation issue or the conflict issue? Mitchell and Stebbins... Are you answering my question then by saying that no, the defense lawyers did not ask to depose Yates specifically, or are you avoiding answering that question? I don't recall a direct request to avoid it because I know the answer. I don't think there is an answer that directly answers that. So I guess I'm limited to that. But I do think at the end of the day, you need... It'd be very easy for the defense to have produced for Judge Yonker a statement from Mitchell or Stebbins that would satisfy this threshold issue. If Mitchell or Stebbins had told Judge Yonker Yates was making decisions, and he was a part of the team, and he was making the call on strategy decisions, that I think might get them over the bar to fall into the small category of people that aren't counsel of record that might qualify for the conflict of interest rules to apply. But they never said anything like that. They had the opportunity to. They talked to Mitchell and Stebbins. They had their entire file, and they didn't produce anything for the judge to decide. Did Mitchell or Stebbins provide any affidavit material or declarations about anything about their behavior in the case? Not that I'm aware of, no. So none was presented to the district court here? No. So our primary point here is that they didn't get over the threshold issue of being counsel for purposes of having a viable claim here. Our secondary point is they have everything they need to present what they need to present to the judge. That is, they talked to the trial team, they had all their notes, and they didn't produce anything to say, oh, this person was actually one of the attorneys for Gabrion under the conflict of interest rules. But they did present evidence of inquiries from Stebbins, I believe, to Yates, asking Yates to undertake certain kinds of evidence, development of the law or other kinds of helpful proceedings, right? Exactly. I think that helps me make my point that they have everything that they need to produce. They had all the internal notes from the trial team. There isn't, I mean, we know everything that was said on the record, so you don't need discovery to discover that. It's out there. We know that Yates never did anything during the trial. That's a matter of public record. There's no need for discovery for that. So if there was a claim, they have all the tools that they need to produce an issue, you know, a material issue, a fact, a dispute, and they never did. So all the discovery in the world wouldn't give them anything else. Well, I guess a question then to take you into the other area that's related is, did Stebbins or Mitchell provide any kind of material in the way of declarations or affidavits having to do with the allegations of ineffective assistance of counsel? In other words, were they cooperative in developing the points that Gabrion's lawyer is making here, or were they actually making the argument that sometimes defense counsel do, which is, hey, we really did a pretty good job, and there's no IAC at all? Well, all I can do is, well, I'll tell you this. We didn't really talk to them about the issue. We know from what the 2255 counsel told Judge Yonker is that they interviewed both of these lawyers and got all of their notes, which indicates to me that there wasn't any hostility there or unwillingness to produce information, and there's been no statement issued about that. So to directly answer your question, no statement or affidavit has been produced involving those two that I'm aware of. Certainly nothing that was filed. Incidentally, I don't have a timer on my screen. We have about 15 minutes left. Okay. I don't want to leave this issue if you have any remaining questions, but I thought I would take up the issue of the mental health claim that my opponent started with. You're exactly right, Judge Moore, that there was no statement filed by 2255 counsel indicating any mental health expert would have testified or would testify that Gabrion's mentally ill in light of this extended family history issue that's been raised. You would expect to see that to create an issue of material fact, but there wasn't anything filed. You got to start with that, as my reading of the discovery for 2255 in the circuit, you have to produce an issue in order to get discovery in a hearing, and they didn't take that small step. Well, couldn't they say that they were relying on academic literature that indicates that a family history of mental illness makes it more likely that an individual will have mental illness, and that that would be a basis to present this evidence, this family history evidence to people who were testifying in favor of the government at the trial? Well, certainly, they have said that. I think that, to me, meets the pretty standard definition of speculation. I mean, who doesn't have somebody that's crazy somewhere in their family history, if you go back far enough? I think what you have to- This was a large number of people. This was not just one crazy uncle. Well, okay. Point taken. But what do you do with the fact that Gabrion was assessed by nine mental health experts in the guilt and penalty phase of this case, and every single time he was given a psychological test that had a validity scale, it showed that he was faking mental illness. That's the gold standard for proving that somebody's mentally ill, not whether your uncle or second cousin is mentally ill. If you want to go to the DSM and talk about that, that's how you show somebody's mentally ill or not. He was given a multitude of tests in this case, and he always showed that he was mentally ill. That stands as an almost insurmountable problem for anybody trying to go back to the mental health issue, which was thoroughly presented in this case. I'd like to remind the court about the evidence that was put on by Mitchell and Stebbins about the mental health claim. They called family members that talked about a multitude of brain injuries suffered by Gabrion. Rebecca Canavan testified. She was Gabrion's girlfriend when they were out west in California. She talked about two head injuries that he suffered, one a motorcycle crash and one a car crash. After that, he wasn't the same person. Elaine Gabrion, his mother, talked about a motorcycle accident. His behavior changed after that. Michael Gabrion, his brother, said that he had many car accidents and many head injuries. After them, he said crazy things that were obviously not true. He was telling his own brother, I'm a Vietnam War veteran, when his brother Michael, of course, knows that he wasn't. That kind of information was presented to the jury through direct testimony of his immediate family. Then, of course, Gabrion himself gave a very clear portrait of somebody being crazy to the jury because when he testified, he told the jury that he was in the CIA and said that he knew that many of the government witnesses against him were pedophiles. It was squarely in front of the jury that he had mental problems if they chose to believe that. My opponent says that the jury gave no credence to this. I disagree. The verdict form that the jury filled out, many of the jurors found that he had features of several personality disorders, including histrionic personality disorder, narcissistic personality disorder, and borderline personality disorder. The jury was listening to this. You could tell by the special verdict form that they filled out in the penalty phase. The problem, of course, was the mental health testing indicated strongly that he was faking. Then, of course, we had direct proof that at least one of the accidents was an insurance fraud. One of the head injuries, we called the participant in this alleged accident who said it was a big hoax. All of that, I think, was thoroughly presented to the jury through direct testimony. Now, adding on indirect proof through, well, family members in the past have had mental problems, I think that falls squarely into the issue that the Supreme Court talks about in saying, looking back in hindsight, you can always do more. That's not the standard for 2255. The standard is, did you do enough to present it to the jury? You're not looking for perfection. What about the point your opponent made about the request to have Gabriel interviewed by a medical professional while in the penitentiary and that being denied without any reason? Well, I frankly don't know what that would serve at this point, 20 years down the road. Let's say somebody talks to Gabriel in 2022 and says, well, he has mental problems. Are we to impute that to Mitchell and Stebbins back in 2002, that they should have somehow known that he would become mentally ill 20 years later? We're supposed to look at the during the trial. And as everybody knows in this case, this is the fourth appeal now on this case. This court has said there was nothing mentally wrong with Gabriel. He was assessed a number of times for competency and more times than that for other mental health issues. And it just came back with a big zero. There's no reason to think he was mentally ill at the time. This is the first time that this court would be looking at the evidentiary material that the 2255 counsel has everyone's radar as this case made it through to trial and the verdict. I mean, the court and his lawyers and even the prosecution wanted to make sure that we had a good handle on his mental health. And that's why he was given three or four competency assessments prior to going to trial, which generated all of these psychological tests that I've been referring to that showed he's how many times do you have to do it before you have your answer? I don't think that the indirect evidence that he had family members with mental problems would would change this one iota. The Social Security disability issue. Yes, I ask you about there was quite a bit of yes, the same family members that talked about the head injuries and injuries to his brain talked about violence in the family. The fact that his father physically and emotionally abused him, that he suffered an impoverished upbringing, that he was let me go to my checklist here. I had a things that I wanted to bring the court's attention about that. Lane Gabrion discuss how they she and her husband had a functional marriage involving fights between the two of them. Both of them are promiscuous. Apparently both of them knocked each other's occasion. The same testimony came from Michael Gabrion, the defendant's brother, Yvonne Wilkinson, his sister, Christine Herman, his other sister. And all of that, of course, as you know, I'm sure was distilled through the testimony of Newton Jackson, who was a psychologist called by the it makes you very likely to have a number of personality disorders and to have a personality or a psyche that's unable to act in a normal fashion when you reach adulthood. So that was, I thought, very capably used by the defense to show. Gabrion has a lot of reasons for acting the way he did, and maybe the jury ought to excuse it. They ultimately did not. But I don't think that that means that his trial attorneys were ineffective. So all of that. Plus, remember, the jury had a lot of evidence about how this crime was committed and its aftermath to show that Gabrion was very capable of acting in a sophisticated manner. He got multiple false IDs after this crime happened, and he admitted he did it beforehand. And he we explained and showed to the jury how he did that. He would meet people supposedly under the guise of possibly hiring them. They give them his their name and social security number, and then he would run off and get a new ID and that person's name and then set up a whole new personality and a whole new identity to stay on the run. This is not somebody that's seriously mentally ill. So one question that your comments trigger that I wanted to be sure to ask was about the social security records vis-a-vis his own social security claim, where he was granted benefits, and apparently he had a payee or several payees showing a lack of mental ability on his own. Could you address where those records are? Judge Moore, I'm sorry, I'm sorry to interrupt, but we've dropped Judge Batchelder. Okay. Do you want me to you want me to pause the timer and let it back on? Definitely. One moment. It appears that Judge Batchelder is back on the line. Judge Batchelder, are you there? I am. Very well. Judge Moore, I'll reset the timer for three minutes. Is that okay? Make it three, make it four minutes because we discombobulated perhaps. Very well. Okay. Okay. To answer the question that Judge Moore raised about the social security disability issue, we actually know quite a bit about that if you know where to look in the trial record. Dr. Walkes, W-A-A-L-K-E-S, testified during the penalty phase for Gabrion. And remember, he worked for the Hope Network, which is a rehabilitation center in the Grand Rapids area. And he told the jury about how he was trying to assess Gabrion's ability to work after this accident that turned out to be an insurance scam. But during that testimony, he said, look, if we can't verify that Gabrion doesn't work, the next stop is he's going to get social security disability because if he can't work, he qualifies for disability. And so when I cross examined him, I asked him about that. And he admitted that if somebody actually does want to get social security disability, he's not going to try hard on these tests and he's going to look impaired when maybe he really isn't. That was followed up by the testimony of social security agent Patricia Harvitz, who testified that one week after Gabrion washed out of the Hope Network, where Dr. Walkes was, he signed up for the social security benefits that his counsel now seeks. I don't know where those benefits are. I don't know where the file is for Gabrion's social security benefits, but we know how he got them. He faked this car accident and then faked out Dr. Walkes at the Hope Network, and then he signed up for social security benefits. That's all been testified to on the record here. So did he go to the social security administration and say, I have a mental illness, please give me benefits and I need a representative payee? Sounds like he did, but does that make any difference at all in a case like this, where there's a mountain of direct evidence about what his mental problems are? I submit not. I don't think that comes close to satisfying the Strickland prejudice standard. So again, I think to get discovery and a hearing and to further delay this matter, you need to show more than what has been shown here about ineffective assistance when it comes to the defendant's mental health or lack thereof. So I guess unless you have further questions for me, I know we didn't touch on a couple of issues, but I can't possibly address those in the time remaining. I just ask that you look at our briefs on those issues, if you have any questions about them that I wasn't able to answer for you. Thank you. Thank you, Your Honor. Rebuttal? Thank you. We're not asking for a lot here. We're asking for a full and fair opportunity to prove our allegations. You look at the Barrett case that is cited in our opening brief. That gentleman originally got no hearing and no relief. The appellate court sent it back for a hearing and things looked very different when it came back. His death sentence was reversed. If you look at the Angela Johnson case, there's an article cited in our brief by Federal District Judge Mark Bennett about that case. He thought he had appointed the DREAM team to represent Angela Johnson, and he didn't realize until after a full and fair hearing that Ms. Johnson, too, had been denied effective counsel. I want to talk about the Yates claim for a minute. The record of the detention hearing on Gabrion's social security trial shows that my opponent, Mr. Verhey, had those social security records at that time. He personally referred to Mr. Gabrion's social security records at that hearing. This was a question that both Judge Gibbons and Judge Moore asked with regard to was Yates actively representing Lunsford at the time of Gabrion's trial. I would refer the court to Lunsford's affidavit where he told Yates that he wanted to recant his statement, his grand jury testimony, his proffer testimony. Again, Yates was present when he proffered. Yates was present at the grand jury. Then Lunsford says that he talked to Yates before he testified at Gabrion's capital trial and said he wanted out of having to testify that it wasn't true. That affidavit suggests that Yates had conversations with Lunsford and was actively representing him at or near the time of the penalty phase. Would it be necessary that he was actually actively representing him or just that Lunsford had had a conversation with Yates? Is it necessary to the claim that he was actively representing him? I don't think that is necessary, but I think that makes the claim stronger. Regarding Judge Gibbons' question about don't the local attorneys use the local federal defender office as a resource, the administrative office of the United States courts has created a resource council for precisely that reason. There is resource council available to consult with trial lawyers, to consult with lawyers on direct appeal. It was not necessary. I don't think my question implied that it was necessary. I'm familiar with what resources the administrative office had, but my point was it's not uncommon for counsel to turn to the local federal defender for certain kinds of assistance. I think that is absolutely correct, Your Honor, but it is uncommon for the local lawyers to look to the federal defender when they have a clear conflict. This was the most disturbing testimony of the penalty phase. Although the record does show that Gabriel was told on the record that he couldn't have Yates, nobody told Gabriel what the conflict was. Which of the things that Yates allegedly did on behalf of Mr. Gabriel do you think constitutes representation of him? Strategizing, meeting with the client, meeting with the client, strategizing, writing motions, all of that constitutes representing Mr. Gabriel. And you believe that Mr. Yates wrote motions on I think that there is sufficient evidence in this record where he's being asked to do that by trial counsel to cause there to be discovery and a hearing. And in regard to your questions, Judge Moore, yes, we requested permission to depose Mr. Yates. Yes, we requested permission to depose trial counsel. And yes, we asked for other instances where the federal public defender office represented witnesses in Gabriel's case. All of that was denied. Mr. Verhey said that we had a discovery request right out of the box that said that we wanted to reinvestigate the entire case. I don't even know what he's talking about. There is no such discovery request on the record in this case. Our requests were specific. They were documented with very good reasons. We had good cause for why we were asking for discovery. We may have told the judge that pursuant to the ABA guidelines for representation in capital cases, we were required to reinvestigate the entire case, but we didn't ask for that in discovery. I see my time is up. Yes. And if there are any further questions, but otherwise I think we appreciate the arguments that both sides have made. And um, we will issue an opinion or opinions in due course. Um, and thank you for your work on the case. Um, I, I, um, know it's been a long standing matter and that it's a very complicated case. So thank you both.